**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BOTTOM LINE, INC. ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| vs. ) | CASE NO. <u>1:15-cv-00445-EGB</u> |
| ) | |
| THE UNITED STATES ) | |
| ) | |
| DEFENDANT. ) | |

**<u>AMENDED COMPLAINT</u>**

COMES NOW, Bottom Line, Inc., through its undersigned attorney, and for its Amended Complaint states as follows:

**<u>PARTIES, JURISDICTION, & VENUE</u>**

1. The Plaintiff, Bottom Line, Inc. (herein "Bottom Line"), is a for-profit corporation duly authorized and existing under the laws of the State of Arkansas. Bottom Line owns lands situated along the Arkansas River and the McClellan-Kerr Arkansas River Navigation System within Segment 2 of Murray Lock and Dam (Little Rock District).

2. The Defendant is the United States of America. The Defendant, by and through the United States Army Corps of Engineers, an agency of the United States of America, has the responsibility, among other things, for the operation, regulation, and control of the Arkansas River and the McClellan-Kerr Arkansas River Navigation System.

3. This Complaint states a cause of action for the taking of private property without just compensation in violation of the Fifth Amendment of the Constitution of the

United States of America, and requests just compensation, money damages, and any and all other available remedies that are available to the Plaintiff. All of the claims arise from the intentional actions of the Defendant regarding the water levels within the McClellan-Kerr Arkansas River Navigation System which exceed the scope of any easements obtained by the Defendant on lands owned by Bottom Line and further has caused and is causing extensive damage and erosion to said lands.

4. This Court has jurisdiction and is the proper venue for this action which is brought pursuant to 28 U.S.C. § 1491 (the "Tucker Act").

## STATUTES AND CONSTITUTIONAL PROVISIONS

5. Plaintiff's claim is governed by the following statues and constitutional provisions:

(a) The Fifth Amendment to the United States Constitution provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation;"

(b) The Tucker Act, 28 U.S.C. § 1491(a), which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded upon the Constitution;" and

(c) The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) provides that just compensation includes, "reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of [the] proceeding."

## STATEMENT OF FACTS

6.      The McClellan–Kerr Arkansas River Navigation System is part of an inland waterway system originating at the Tulsa Port of Catoosa and running southeast through Oklahoma and Arkansas to the Mississippi River. The McClellan–Kerr Arkansas River Navigation System is under the operation, regulation, and control of the Defendant.

7.      The McClellan–Kerr Arkansas River Navigation System officially opened June 5, 1971 and was designed and constructed to provide reliable commercial navigation. The Arkansas River was very shallow through Arkansas and Oklahoma and was naturally incapable of supporting river traffic most of the year. To allow for navigation on the river, a system of channels and locks was built to connect the many reservoirs along the length of the Arkansas River. The system was designed to operate with a minimum channel depth of at least nine (9) feet and the Defendant purposefully makes and has made decisions in the operation of the system to maintain the minimum channel depth.

8.      The property at issue in this litigation is situated within Rector Chute – Vicinity of the Maumelle Ordinance Works, Segment 2, of Murray Lock and Dam within Township 2N, Range 13W, Sections 5 and 6. A copy of the legal description of the subject property is hereby marked and attached as "**Exhibit A**" and incorporated by reference. At all times relevant to this litigation, Bottom Line has owned and held title to the aforementioned lands.

9.      The flowage easements purchased by the Defendant on the subject property, as part of the development of the navigation system project, provided a

flowage easement up to the elevation of 252.0. Further, the design plans called for the construction of a revetment (referred to as "Revetment 178.7L" in the plans) along the subject property to an elevation of 254.0. This revetment was installed to change the course of the river and to maintain the depth of the navigation channel.

10. The flowage easements on the subject property were purchased to account for wave action, saturation, and fluctuation of the navigation pool levels behind Murray Lock and Dam through its maximum operating range to maintain navigation. Thus, the flowage of water up to an elevation of 252.0 feet was contemplated within the development plan of the navigation system in this section of the river.

11. Bottom Line purchased the subject property on July 18, 2006 for the purpose of building an exclusive and/or high-end residential development to be situated along the banks of the Arkansas River. Bottom Line had developed a similar property across the Arkansas River from the subject property and had been successful is selling out the subdivision and generating a profit on the venture in a short amount of time. Bottom Line's development plan on the subject property called for fifteen (15) high-value residential lots along the river bank. A residential development was a permitted use of the property and Bottom Line obtained all necessary permits and began work on the project.

12. All planning for Bottom Line's development was based on the fact that the property was subject to a flowage easement up to the elevation of 252.0. The flowage easement had long been set aside for routine, but non-injurious flows of high water. The aforementioned occasional flowage easement did not present an inundation problem to the residential development plan even though a portion of the subject property would

flood or become saturated if it was fully utilized. Bottom Line took a reasonable approach in the development plan of the subject property which contemplated a limited number of spacious lots that would allow ample space to deal with any natural flooding of the subject property.

13.     Further, the design plan considered that if the flowage easement should become fully utilized, it would not impair the ability to maintain a consistently dry access road to the residential development and the property owners would also continue to have a suitably dry yard on each home site because the elevations were higher than the flowage easement.

14.     On or about May 3, 2009, the owner of Bottom Line visited the subject property and witnessed a "flood event." It was at this time Bottom Line first learned that the Defendant was exceeding the elevations of the flowage easements, that the property was flooded, and that the lands would be cut-off and have no passable road access during such an event. Additional "flood events" was also personally observed by the owner of Bottom Line on or about April 26, 2011.

15.     Once the owner of Bottom Line observed the flooding, he began his quest to determine the cause of said flooding. Given that the subject property was at comparable elevations of the lands he developed across the river, he retained surveyors to determine the water surface elevation of the floodwaters crossing the property. On each occasion, it was determined that the floodwaters were significantly higher than the 252.0 elevation for the flowage easement and also the elevation of the revetment.

16.     Bottom Line also retained the services of engineers to review the flooding of the property. After evaluating the subject property, it was determined that flood waters exceeded the 252.0 flowage easements when the flow rates along the river reached in excess of 195,000 cfs or greater and that the Defendants operation, management, and control of the river system to maintain navigation and the minimum channel depth was the direct and proximate cause of the water elevations exceeding the existing flowage easement.

17.     The intentional conduct of the Defendant to maintain the navigational system and minimum channel depth, which leads to the flooding of the subject property above any existing flowage easements, is a predictable and expected result and rises to the appropriation of an additional flowage easement on and over said property.

18.     Further, the Defendant is aware and has actual knowledge that the operation, management, and/or control of this segment of the river system requires flowage easements to a higher elevation than it currently maintains on and over the subject property; but the Defendant has refused to acquire the additional easements. Specifically, the Defendant has made a determination that flowage easements up to 254.0 are required on the subject property and has developed engineering drawings and/or maps to that effect. In addition, the Defendant has acquired higher flowage easements on and over other real property situated within this segment of the river system to an elevation of 254.0. The Defendant has indicated to Bottom Line that it has not acquired the easements on the subject property due to a lack of funding for the acquisition.

19. The aforementioned purposeful conduct of the Defendant has resulted in frequent and repeated flooding of the subject property for long periods of time and this flooding is expected to continue in the future because it is necessary for the Defendant's navigational needs on the river.

20. The high frequency and lengthy flooding of the subject property by the Defendant has additionally caused significant erosion of the subject lands and has permanently destroyed the economic viability of a residential development on the subject property. This is particularly true because a flowage easement to the elevation of 254.0 would place over one-half (1/2) of the developable land and any means of ingress/egress to the subject property under water.

21. As a result of the above-referenced intentional conduct and associated flooding of the subject property, Bottom Line has suffered damages of Four Million Dollars ($4,000,000).

## CAUSE OF ACTION
## INVERSE CONDEMNATION FOR PHYSICAL TAKING

22. All preceding paragraphs of this Complaint and incorporated herein by reference.

23. At all times relevant to this Complaint, Bottom Line owned and held title to the subject property at issue in this litigation.

24. The Defendant's action in the operation, regulation, and control McClellan–Kerr Arkansas River Navigation System has led and leads to flooding and erosion of the subject property above any existing flowage easements and such flooding and erosion is a predictable and expected result and rises to the appropriation

of an additional flowage easement on and over said property. This action is and was for a public use or purpose.

27. The Defendant's purposeful conduct in raising the river level and exceeding the existing flowage easements to maintain the navigational system and minimum channel depth interferes with and substantially disturbs Bottom Line's use and enjoyment of the subject property and deprives Bottom Line of most of its interests in the lands.

26. The subject property has been damaged by the physical invasion of flood waters by and through the direct, natural, and probable result of the Defendants' activities.

27. The aforementioned flooding and erosion of the subject property is a predictable and expected result and rises to the appropriation of an additional flowage easement on and over said property. This appropriation of the additional flowage easement is a benefit to the Defendant and the public at large at the expense of Bottom Line and preempts Bottom Line's right to enjoy the subject property for an extended period of time.

28. That the flooding of the subject property has caused damage and rendered the property unusable for its intended use which constitutes a taking of Bottom Line's property by the Defendant without just compensation in violation of the Fifth Amendment to the United States Constitution.

29. That the losses sustained by Bottom Line are the direct and proximate result of the Defendant's purposeful conduct in exercising its operation, regulation, and control of the McClellan-Kerr Arkansas River Navigation System.

30. The aforementioned actions of the Defendant constitute a taking of Bottom Line's property under the Fifth Amendment to the United States Constitution.

31. As a result of the appropriation of Bottom Line's private real property by the Defendant for public use, Bottom Line has suffered damages of Four Million Dollars ($4,000,000) and is entitled to a payment of just compensation including reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, incurred pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act.

WHEREFORE, the Plaintiff, Bottom Line, Inc., prays for judgment against the United States in the amount of Four Million Dollars ($4,000,000) to sufficiently and fairly compensate it for the taking of its private property, for reasonable attorney's fees, costs, and expenses, and for all other just and proper relief to which it is entitled.

Respectfully submitted,

_____
Brandon Moffitt, Ark. Bar. 06148
Moffitt & Phillips, PLLC
204 Executive Ct., Suite 100
Little Rock, AR 72205
501.255.7406 telephone
866.460.5744 fax
bmoffitt@moffittandphillips.com

Signed this 22nd day of January, 2016.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22<u>nd</u> day of January, 2016, I electronically filed the foregoing document with the United States Court of Federal Claims by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Mr. Frank J. Singer, Esq.
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Post Office Box 7611
Washington, D.C. 20044-7611
E-mail: frank.singer@usdoj.gov

_____
Brandon Moffitt

Legal Description - Estates of Maumelle Cove (Lots 1-15, Tract 1 and Tract 2)

Part of the NE 1/4, Section 6 and the NW 1/4, Section 5,Township 2 North, Range 13 West, City of Maumelle, Pulaski County, Arkansas, more particularly described as follows:

Commencing at the NE corner, NE 1/4, Section 6; thence S 01°49'58"W for a distance of 594.85' to a point on the south property line of the Maumelle Country Club; thence along said property line the following courses: N 79°59'12" W, 832.32'; N 83°51'01" W, 382.32'; to the Point of Beginning; thence departing said property line South 44°14'42" East, a distance of 966.07 feet; thence South 53°30'29" East, a distance of 48.41 feet; thence South 62°47'39" East, a distance of 195.23 feet; thence South 56°02'37" East, a distance of 62.34 feet; thence South 50°04'47" East, a distance of 130.59 feet; thence South 34°54'58" East, a distance of 156.95 feet; thence South 19°45'09" East, a distance of 287.17 feet; thence South 49°23'39" East, a distance of 148.37 feet; thence South 79°02'09" East, a distance of 228.83 feet; thence South 85°40'32" East, a distance of 34.69 feet; thence North 87°41'06" East, a distance of 106.76 feet; thence South 77°41'37" East, a distance of 75.73 feet; thence South 63°04'20" East, a distance of 121.39 feet; thence South 65°49'55" East, a distance of 19.26 feet; thence South 68°35'29" East, a distance of 339.71 feet; thence South 54°56'52" East, a distance of 141.53 feet; thence South 41°03'22" East, a distance of 1946.02 feet; thence South 55°54'15" East, a distance of 153.76 feet; thence South 72°34'31" East, a distance of 1065.95 feet; thence South 25°57'29" West, a distance of 182.61 feet; thence South 67°06'52" East, a distance of 332.82 feet; thence South 51°45'02" West, a distance of 19.22 feet; thence South 68°30'08" West, a distance of 52.94 feet; thence South 63°26'49" West, a distance of 57.51 feet; thence South 63°23'18" West, a distance of 92.97 feet; thence North 81°01'20" West, a distance of 65.25 feet; thence North 46°09'38" West, a distance of 10.64 feet; thence North 67°19'38" West, a distance of 41.76 feet; thence South 85°31'39" West, a distance of 34.73 feet; thence South 46°36'45" West, a distance of 26.72 feet; thence South 70°17'44" West, a distance of 12.70 feet; thence South 78°19'56" West, a distance of 18.60 feet; thence South 72°27'35" West, a distance of 18.47 feet; thence South 41°45'56" West, a distance of 24.41 feet; thence South 21°52'15" West, a distance of 30.39 feet; thence South 31°27'55" West, a distance of 18.17 feet; thence South 13°01'25" West, a distance of 28.72 feet; thence South 01°12'34" West, a distance of 29.73 feet; thence South 09°54'13" East, a distance of 22.75 feet; thence South 41°53'35" West, a distance of 11.72 feet; thence South 77°45'13" West, a distance of 30.50 feet; thence South 85°08'50" West, a distance of 26.50 feet; thence South 73°55'23" West, a distance of 20.32 feet; thence North 70°05'20" West, a distance of 18.29 feet; thence North 70°36'14" West, a distance of 502.96 feet; thence North 60°43'33" West, a distance of 376.38 feet; thence North 54°53'04" West, a distance of 218.69 feet; thence North 54°53'04" West, a distance of 195.49 feet; thence North 45°34'21" West, a distance of 137.45 feet; thence North 45°34'21" West, a distance of 119.96 feet; thence South 80°25'32" West, a distance of 48.36 feet; thence South 63°39'35" West, a distance of 42.60 feet; thence North 25°17'14" West, a distance of 63.46 feet; thence North 54°41'42" West, a distance of 34.23 feet; thence North 54°41'42" West, a distance of 149.18 feet; thence North 35°19'33" West, a distance of 105.55 feet; thence North 35°19'33" West, a distance of 251.26 feet; thence North 35°19'33" West, a distance of 81.37 feet; thence North 29°32'20" West, a distance of 172.51 feet; thence North 29°32'20" West, a distance of 255.14 feet; thence North 29°32'20" West, a distance of 87.34 feet; thence North 01°59'52" East, a distance of 75.89 feet; thence North 48°41'45" West, a distance of 56.56 feet; thence South 80°24'59" West, a distance of 52.62 feet; thence North 56°18'01" West, a distance of 26.36 feet; thence North 56°18'01" West, a distance of 149.76 feet; thence North 23°42'53" West, a distance of 110.53 feet; thence North 23°42'53" West, a distance of 308.18 feet; thence North 41°44'36" West, a distance of 479.64 feet; thence South 85°43'35" West, a distance of 352.57 feet; thence South 35°46'57" West, a distance of 122.82 feet; thence North 44°36'52" West, a distance of 189.15 feet; thence North 36°48'33" West, a distance of 156.12 feet; thence North 36°48'33" West, a distance of 360.09 feet; thence North 36°48'33" West, a distance of 428.81 feet; thence North 36°48'33" West, a distance of 943.18 feet; thence South 90°00'00" East, a distance of 35.45 feet; thence South 90°00'00" East, a distance of 22.40 feet; thence North 89°59'24" East, a distance of 18.36 feet to the Point of Beginning. Containing 56.0040 Acres, more or less. Less and except those properties owned by MSID 500 and subject to all easements of record.

Exhibit A