```
 1            IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3
 4   BOTTOM LINE, INC.,                  )
 5          Plaintiff,                   ) Case No.
 6      vs.                              ) 15-445L
 7   THE UNITED STATES OF AMERICA,       )
 8          Defendant.                   )
 9
10
11                        Suite A-805
12          Howard T. Markey National Courts Building
13                  717 Madison Place, N.W.
14                      Washington, D.C.
15                 Tuesday, January 9, 2018
16                        10:00 a.m.
17             Telephonic Status Conference
18
19
20        BEFORE:  THE HONORABLE ERIC G. BRUGGINK
21
22
23
24
25   Transcribed by:  George Quade, CERT
```

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFF:
 3           BRANDON K. MOFFITT, ESQ.
 4           Moffitt & Phillips, PLLC
 5           204 Executive Court
 6           Suite 100
 7           Little Rock, Arkansas 72205
 8           (501) 225-7406
 9           (866) 460-5744 (fax)
10           bmoffitt@moffittandphillips.com
11
12    ON BEHALF OF THE DEFENDANT:
13           KRYSTALYN KINSEL, ESQ.
14           U.S. Department of Justice (ENRD) (G)
15           P.O. Box 663
16           601 D Street, NW
17           Washington, D.C. 20004-0663
18           (202) 305-0484
19           (202) 305-0506 (fax)
20           krystalyn.kinsel@usdoj.gov
21
22
23
24
25
```

```
 1                   P R O C E E D I N G S
 2                    -    -    -    -    -
 3              (Proceedings called to order at 10:00 a.m.)
 4              THE COURT:  -- chat with you about the JPSR
 5   before turning you loose.  The -- I mean, there's nothing
 6   that earth-shattering about it.  It's just that the
 7   amount of time that you all have devoted in the future
 8   for both fact and expert discovery is kind of long, and I
 9   wondered how those dates were arrived at since we're
10   looking at 15 months out for the -- sort of the closing
11   status report.
12              So who wants to talk to me?
13              MS. KINSEL:  I can, Your Honor.  This is
14   Krystalyn Kinsel with the United States.
15              THE COURT:  All right.
16              MS. KINSEL:  So, as you know, many of the
17   events that are important to this case occurred in the
18   late '80s to early '90s and even earlier than that.
19   Since that time, many of the core employees and others
20   with first-hand knowledge have either retired or moved
21   on.  Therefore, we need time to track down former
22   employees and others with first-hand knowledge of the
23   events that unfolded in this case.
24              And we also need time to conduct third-party
25   discovery of prior landowners, surrounding landowners,
```

1   and even the city.  And then finally this case will
2   involve discrete areas of expertise.  I think both
3   parties will need time to develop those expert opinions
4   as we move on.
5           So together both parties agreed on these dates,
6   taking all of those items into consideration.  And up to
7   now, the parties have had a very productive relationship
8   and have worked well together.  And, of course, if we
9   don't need the time, then, you know, the United States
10  will certainly let Plaintiffs know and the Court know as
11  well.
12          THE COURT:  Tell me, if I could, Mr. Moffitt,
13  the complaint was filed in -- May 1st, 2015.  That looks
14  like about six years after your folks figured out what
15  was going on.  Is that fair to say?
16          MR. MOFFITT:  Yes, Your Honor.  It's close.  I
17  mean, basically we filed before the first event that my
18  client noticed the flooding, or he claims he noticed the
19  flooding, although it wasn't until a number of years
20  after 2009 until he kind of decided what was really going
21  on.  So it was about six years from when he saw --
22  personally saw the property flood.
23          THE COURT:  The original easement, the 252-foot
24  easement, was that formally articulated in those numbers
25  in some fashion?

1   MR. MOFFITT:  Yes.  So the 252 was acquired
2   back in, I think, the '60s.  I'd have to go back and see.
3   Two fifty-two is the long-standing easement for the area.
4   THE COURT:  Okay.  So that's -- I mean, it was
5   -- at some point the Complainant said that it was
6   contemplated, but you're saying it's actually written
7   that way.  That's what -- you went to the property
8   records, the Government would have them and then you can
9   look (inaudible) 252 feet?
10  MR. MOFFITT:  Yes.  But what we're actually
11  claiming now is they're actually appropriating up to 254.
12  THE COURT:  Okay.  And how -- if you can tell
13  me, or maybe you can figure that out, how is it that the
14  Government is able, first of all, to do that.  What
15  physically has changed in terms of locks and dams and
16  that kind of thing?
17  MR. MOFFITT:  So --
18  THE COURT:  Or (inaudible) practice.
19  MR. MOFFITT:  Well, we haven't got all the
20  documents, so it might -- no, my understanding is
21  basically that either there was an operational change or
22  there's some testimony that the original design of the
23  river, the Government did not calculate the actual
24  correct easement that they needed.  And they didn't
25  discover that until maybe the late '80s -- and Krystalyn

```
 1   can maybe clarify that a little -- when they did a flood
 2   study.  And at that point they decided --
 3              THE COURT:  And at the time they originally
 4   built these structures, they were physically capable
 5   perhaps of going up to 254.  They didn't know it.  And,
 6   in fact, in practice within the last six years of the
 7   complaint, they've actually been utilizing a higher
 8   easement.
 9              MR. MOFFITT:  Yes.
10              THE COURT:  Okay.
11              Ms. Kinsel, have you found out anything
12   different than that?
13              MS. KINSEL:  You know, we're still conducting
14   discovery.  We're still -- I'm still looking into that,
15   Your Honor.
16              THE COURT:  And back to Mr. Moffitt.  How much
17   acres are we talking about?  The total acres that your
18   client owns and then the amount of additional land that's
19   floodable at 254 feet?
20              MR. MOFFITT:  So basically -- I'd have to look
21   because he sold some off.  I think he has like 90 acres.
22   It's a platted residential subdivision.  And if the
23   Government is utilizing up to 254, that inundates over 90
24   percent of his usable land, at times when they exercise
25   up to 254.
```

Bottom Line, Inc. v. USA                                1/9/2018

```
 1              THE COURT:  Have you seen it?
 2              MR. MOFFITT:  I have seen photographs and I
 3    have been on the property.
 4              THE COURT:  Okay.  And is it close to Little
 5    Rock?
 6              MR. MOFFITT:  Yes, Your Honor.
 7              THE COURT:  I mean, within the --
 8              MR. MOFFITT:  It's within -- it's within
 9    Maumelle, which is north and west of the city.  From
10    downtown Little Rock, it is 20 minutes.
11              THE COURT:  Okay.  And so do we know why other
12    landowners have not sued, or have they?
13              MR. MOFFITT:  Well, the -- a number of
14    landowners have had easements purchased by the
15    Government.  At least I've dug up a couple in my search
16    trying to figure out what was going on, and the
17    Government actually purchased the easement from -- I
18    don't want to say adjoining in the neighbor, I can't
19    remember about the adjoining landowners.  I believe they
20    have purchased from adjoining.  And --
21              THE COURT:  You mean at the higher elevation?
22              MR. MOFFITT:  Yes, Your Honor.
23              THE COURT:  Oh, I see.
24              Ms. Kinsel, anything you can tell me on that?
25              MS. KINSEL:  No, Your Honor.  I -- like I said,
```

1   we're still conducting -- or I'm still looking into this.
2   I took over this case just in October.  So these are
3   certainly issues that I'm trying to dig into.
4           THE COURT:  Well, I'm not trying to tell you
5   all your business, but if the Corps has been buying from
6   adjoining landowners up to 254 feet, it looks to me like
7   he might want to consider buying this chunk of land from
8   the Plaintiff, or at least an easement.
9           Are there bluffs along the river there, or it's
10  fairly shallow terrain?
11          MR. MOFFITT:  This is fairly -- I mean, there
12  are bluffs, but this land is flat and level.  It's
13  actually a peninsula that is out into the river.  So
14  there's a break on the -- I call that the west/northwest
15  side, and then the river -- it actually is riverfront on
16  the southern side.
17          THE COURT:  Now, are there houses on the
18  peninsula?
19          MR. MOFFITT:  No, Your Honor.  This is a -- my
20  client purchased the property to do a development, and so
21  he went, platted, subdivided and was beginning -- he
22  purchased the land in 2006.  He had to deal with a number
23  of lawsuits.  Basically an adjoining golf course and some
24  property owners complained about his ingress/egress.  He
25  had some fights with the city.  So he basically bought

```
 1   himself about two or three years of litigation, and he
 2   finally got that resolved and began constructing his
 3   subdivision.  And at that point in 2009 is when he
 4   observed the initial flooding of the property.
 5              THE COURT:  Is there any blacktop road out to
 6   these lots?
 7              MR. MOFFITT:  There is a road bed.  It is not
 8   paved or blacktopped yet.  He basically has gravel road
 9   and then just hard-packed dirt.  And once he observed the
10   flooding, he kind of shut down his operation to figure
11   out what was going on.  But there's clearly roads and
12   gravel roads and we can get access to the property.
13              THE COURT:  Do you know what he paid for it?
14              MR. MOFFITT:  He paid initially, I think,
15   $300,000 for this property.
16              THE COURT:  Is that -- you said 90 acres?  Is
17   that what you said?
18              MR. MOFFITT:  It was more than that.  It was --
19   there's been lots of transactions.  He paid like $300,000
20   for a couple hundred -- I think it was like 200 acres.
21   He sold a portion of that to the city.  Everything below
22   252, he sold that to the city for a park.  And his
23   development included access trails and things where the
24   city could utilize that land.  He -- to resolve some of
25   the other lawsuits and kind of facilitate development, he
```

1   purchased additional land adjacent to this, which became
2   a subdivision and his access road and began building an
3   access road down through -- relocating the access road
4   from the golf course to around the golf course.
5         THE COURT: Okay.
6         MR. MOFFITT: And so --
7         THE COURT: And the park land, is that -- is
8   that between where the lots would be and the water?
9         MR. MOFFITT: On one side. So basically the
10  southern side of the peninsula, all the lots are
11  waterfront. On the north side, everything that's below
12  252 was sold to the city and is the park land. That land
13  also is waterfront, but it doesn't front the actual river
14  channel. It fronts a break.
15        THE COURT: Mm-hmm. And has the city done
16  anything with that?
17        MR. MOFFITT: No. They've just been kind of
18  sitting around, you know, waiting for the development.
19        THE COURT: Mm-hmm.
20        So, Ms. Kinsel, am I right in assuming that you
21  don't know what it is that the Corps does that might
22  periodically trigger anything, if it does, going up to
23  254?
24        MS. KINSEL: I'm sorry, Your Honor, I didn't
25  catch that.

```
 1              THE COURT:  Do you know what it is that
 2   triggers -- well, on occasion or if that's what it is,
 3   the Corps flooding up to 254?  Do you know what triggers
 4   that?
 5              MS. KINSEL:  I do not, Your Honor.
 6              THE COURT:  Okay.
 7              And, Mr. Moffitt, any idea how often that
 8   happens?
 9              MR. MOFFITT:  We think it's -- so basically
10   where we are now, we believe it happens a couple times a
11   year and it's for a fairly significant duration as it
12   pertains to a subdivision.  Essentially my client hired
13   an engineer to conduct a flood study to try to determine
14   what was going on, and he has one portion of his property
15   that is -- essentially this is Peninsula.  So this is the
16   entry point of his property.  That's actually around 253
17   elevation where his roadway is.
18              And so when we were getting the floods for long
19   durations of time, this is, again, his expert, his
20   opinion, that we're seeing these floods go for like seven
21   or ten days, which the peninsula then becomes an island.
22   So we're actually experiencing, you know, the impairment
23   to our ingress/egress to our development before we even
24   get to 254.  We just know that 254 is what is anticipated
25   for the property around.
```

```
 1              And so what happens, then this causes a
 2   critical flowage zone or something like that in his
 3   report, is that when the water comes up you essentially
 4   cut off all ingress/egress, and so, therefore, my client
 5   has some real concerns about selling lots that, you know,
 6   we may have to rescue people to get out in a flowage
 7   event -- or a flood event.
 8              THE COURT:  Okay.
 9              MR. MOFFITT:  So we believe that it's -- you
10   know, we're -- his report shows anywhere from -- you
11   know, some years I think -- in the last 20 years he
12   looked at, we had no events.  But most years we've had at
13   least one, usually two.  Since 2006-ish, there seems to
14   be an increase.  And that's something that we're trying
15   to figure out, if there's been an operational change
16   since that time that's actually made the frequency
17   increase.  But we're seeing, you know, one to two events
18   from, you know, five to seven days, five to ten days,
19   occur.
20              THE COURT:  Okay.  So you all agree on the
21   schedule, I gather.  Let me go back to it for a minute.
22   So the document exchange in a month and a half; fact
23   discovery, the 15th, then it plays out.
24              Well, I'll go ahead and adopt it.  It just --
25   it seems to me it's a bit generous given the case.  It
```

```
 1   looks to me like it would be fairly straightforward to
 2   figure out what has happened and what the impact is.  And
 3   my only thought would be assuming that we're not talking
 4   about a limitations problem, if, in fact, the Government
 5   plans on flooding this land up to 253 or -4 on occasion
 6   for significant periods of time, it ought to just go
 7   ahead and buy it.  But I'll leave that to you folks.  Of
 8   course, that begs the question of what it's worth.  But
 9   that's all that I needed to know for the time being.
10              Anything else, Mr. Moffitt, you need to tell
11   me?
12              MR. MOFFITT:  No, Your Honor.
13              THE COURT:  Okay.  And, Ms. Kinsel?
14              MS. KINSEL:  No, Your Honor.  Thank you.
15              THE COURT:  Okay.  I would just ask that you
16   explore some of this stuff fairly quickly to see if the
17   game is worth the candle, as it were, rather than spend a
18   year and a half on something that may be pretty
19   straightforward.  Okay.  Thank you, folks.
20              MS. KINSEL:  Thank you.
21              MR. MOFFITT:  Thank you.
22              THE COURT:  Bye-bye.
23              (Whereupon, at 10:15 a.m., the conference was
24   adjourned.)
25
```

Bottom Line, Inc. v. USA																					14
																																				1/9/2018

```
 1                    CERTIFICATE OF TRANSCRIBER
 2
 3           I, George Quade, court-approved reporter,
 4   certify that the foregoing is a correct transcript from
 5   the official electronic sound recording of the
 6   proceedings in the above-titled matter.
 7
 8
 9
10   DATE:   1/25/2018               s/George Quade
11                                   GEORGE QUADE, CERT
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```